OAO106 (Rev. 12/03) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF   CALIFORNIA

08 MAY 19 AM 10: 32

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)
THE PREMISES COMMONLY KNOWN AS 2727 ELROSE DRIVE, SAN DIEGO, CALIFORNIA

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

Case Number: '08 MJ 1563

I, TERRY C. REED, JR. being duly sworn depose and say:

I am a(n) FBI SPECIAL AGENT and have reason to believe
                Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)
SEE ATTACHMENT A

in the   SOUTHERN _____ District of   CALIFORNIA

there is now concealed a certain person or property, namely (describe the person or property to be seized)
SEE ATTACHMENT B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
EVIDENCE OF A CRIME; CONTRABAND, FRUITS OF CRIME, AND OTHER ITEMS ILLEGALLY POSSESSED; AND PROPERTY DESIGNED OR INTENDED FOR USE OR WHICH WAS USED IN COMMITTING A CRIME

concerning a violation of Title  8/18/21  United States code, Section(s)  1324/201, 371/952, 960, 963
The facts to support a finding of probable cause are as follows:
SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:   ☑ Yes   ☐ No

_____
Signature of Affiant (Terry C. Reed, Jr.)

Sworn to before me and subscribed in my presence,

5/16/08                                         at   SAN DIEGO, CALIFORNIA
Date                                                   City                State

CATHY ANN BENCIVENGO
U.S. MAGISTRATE JUDGE
Name of Judge       Title of Judge              Signature of Judge

## A F F I D A V I T

TERRY C. REED, JR., being duly sworn, states:

1.  I am a special agent with the Federal Bureau of Investigation and have been so employed for about 4 years. I am assigned to the San Diego Field Division. From November 2004 to present, I have been assigned to the Border Corruption Task Force. I have served as the case agent for multiple corruption investigations, that is, I have supervised and directed such investigations. I have used many investigative techniques. For example, I have interviewed and operated informants. I have conducted searches, arrests, interviews, and physical and electronic surveillances. I have directed undercover investigations. I have also worked and consulted with numerous law enforcement officers experienced in border corruption investigations. This training and experience forms the basis for opinions expressed below.

2.  This affidavit supports an application for a warrant to search and seize evidence from the premises commonly known as 2727 Elrose Drive, San Diego, California, more particularly described in attachment A to the search warrant, incorporated herein.

3.  Based on information below, I have probable cause to believe that in the property in paragraph 2, there is evidence of a crime; contraband, fruits of crime, and other items illegally possessed; and property designed or intended for use or which was used in committing a crime. Specifically, I have probable cause to believe that within the above property is evidence of importing a controlled substance and conspiracy to do same (21 USC 952, 960, 963); alien smuggling and conspiracy to do same (8 USC 1324 and 18 USC 371); and bribery of public officials (18 USC 201).

4.  The evidence to be searched for and seized is listed in attachment B to the applicable warrant, incorporated herein.

5.  The following is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, interviews, subpoenaed and public records, database checks, searches, phone analysis, and other investigation. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested warrant. Dates and times are approximate.

## PROBABLE CAUSE

6.  At all times relevant to this affidavit, Luis Francisco Alarid has been employed by the Department of Homeland Security, Bureau of Customs and Border Protection, as an officer assigned to the Otay Mesa Port of Entry (POE) in San Diego County.

7.  On 2/14/08, agents watched as Alarid manned primary lane 4 at the Otay Mesa POE. At 12:15 am, a minivan approached Alarid's booth. Alarid took something from the driver and made a swiping gesture in his booth. Alarid then admitted the van without further inspection. Agents saw the minivan's rear license plate as it passed their position nearby. The first and last digits were taped over which, I believe, was designed to prevent the automatic license plate reader from accurately reading the plate and retrieving vehicle information. Agents

2

later determined that the plate reader responded "no plate." Upon obtaining that response, Alarid should have visually checked and manually inputted the rear plate himself, which he did not do. The minivan, followed by a Toyota, drove to a house on 5th Street in Chula Vista where the driver got out. Agents could not see what happened at the minivan thereafter, but the Toyota circled the block several times. I believe the Toyota was conducting counter-surveillance. Several minutes later, the minivan moved to a parking lot on E Street. The driver got out, walked to a trolley station, and made a call. Shortly after, a Chevrolet registered to Israel Alarid picked up the driver and took him to the San Ysidro POE. Israel Alarid is believed to be CBPO Luis Alarid's cousin. Meanwhile, agents maintained surveillance on the minivan at the parking lot. Several hours later, patrol officers responded and determined the van was stolen. They found nothing inside. Based on events below, I believe the van was used to transport aliens and/or narcotics into the United States. I believe the aliens and/or narcotics were offloaded at the house on 5th Street.

8. On the same date, at 12:26 am, agents watched as Alarid manned primary lane 3 at the Otay Mesa POE. A minivan approached Alarid's booth. Agents later saw that the first and last digits on the rear plate were also taped over. The plate reader again responded "no plate." Alarid did not visually inspect the rear plate and instead admitted the van without further inspection. The van drove to a shopping center in Chula Vista and parked. The female driver got out, walked to a convenience store, and hailed a cab that took her to the San Ysidro POE. She ran into Mexico. Meanwhile, at the shopping center, agents maintained surveillance on the van. Jose Angulo eventually arrived and started driving away in the van. Patrol officers stopped Angulo and found ten illegal aliens, not including Angulo, inside the passenger/cargo area.

9. On 3/5/08, at 11:25 pm, Alarid arrived at the employee parking lot for the Otay Mesa POE and entered the building. Shortly after, he returned to his car for about three minutes. Agents could not see what he was doing, but based on events below, I believe he was phoning smugglers in Mexico to notify them which lanes he was scheduled to work that night. On 3/6/08, at 12:56 am, agents watched as Alarid manned primary lane 4. A white minivan approached. The first and last digits on the rear plate were taped over. The driver handed Alarid some documents. Alarid looked briefly at them, looked over his shoulder, turned slightly towards his booth, did not visibly swipe or key in anything, then turned back to the driver, returned the documents, and motioned for him to proceed forward. This sequence took about four seconds. Several seconds later, Alarid's relief walked into his booth. I believe Alarid noticed his relief approaching and determined he did not have time to make gestures consistent with swipes or keyboard entries. The van drove to a residence on Estelle Street in San Diego. The van's doors opened, but agents could not see if anyone got out or walked inside. Several hours later, at 4:15 am, five individuals walked out of the residence, got in a car, and eventually headed eastbound on I-94. I believe the Estelle Street house was used to stash aliens and/or narcotics offloaded from the van.

10. On the same date, at 12:59 am, agents watched as Alarid manned primary lane 3 at the Otay Mesa POE. A red Ford Windstar minivan approached. The van had commercial license plates which, later investigation determined, belonged to a GMC pickup truck. This information should have appeared on a screen in Alarid's booth. Alarid instead

3

admitted the van without further inspection. Agents were unable to follow, but at 1:27 am, Chula Vista police officers responded to a call of suspicious behavior at a van in the parking lot of a donut shop. Officers found four illegal aliens and about 264 pounds of marijuana inside the van, a red Ford Windstar with commercial plates. The 21 bundles of marijuana were sitting openly in the van's cargo area, under two blankets.

11. On 3/12/08, Alarid put down $13,000, all in $100 bills, at a San Diego motorcycle store towards the purchase of a motorcycle. Specifically, records indicate Alarid put down $3000 in cash, then returned later that day and put down an additional $10,000 in cash. (Business transactions over $10,000 in cash must be reported to the federal government.) On 3/13/08, Alarid paid the remaining $2500 balance for the motorcycle, also in $100 bills. At the time, Alarid had a checking account and several credit cards. Income from his employment with DHS was deposited directly into his checking account, and his checking account contained no corresponding withdrawals. Accordingly, I believe the cash deposited for the motorcycle was proceeds from illegal activity.

12. On 3/12/08, at 11:30 pm, Alarid arrived at the employee parking lot for the Otay Mesa POE, parked, and walked inside. Shortly after, he returned outside and spent several minutes talking on a cell phone. Alarid then walked back in the building. I believe he was notifying smugglers in Mexico which lanes he was scheduled to work that night. On 3/13/08, at 12:56 am, Alarid was manning primary lane 3 when the same white Ford minivan from 3/6/08 approached. Later investigation determined the van's license plate–the same plate that was partially taped over on 3/6/08–belonged to a Plymouth, which should have appeared on a screen in Alarid's booth. Alarid contacted the driver, turned towards his booth (where his actions could not be seen), then turned back to the driver and motioned him through. This sequence took about six seconds. Agents followed the van until, at 1:05 am, patrol officers stopped it on I-905. The driver was Cesar Alarid, defendant Luis Alarid's uncle and Israel Alarid's father. Openly situated in the rear passenger/cargo area of the minivan were 18 illegal aliens. they smelled a pungent odor. Officers thereafter found about 173 pounds of marijuana in garbage bags inside the van.

13. On 4/4/08, at 1:19 am, Alarid was manning primary lane 4 at the Otay Mesa POE. At the time, a Nissan Pathfinder was third in line for that lane. Alarid's relief appeared, causing Alarid to switch to primary lane 3. At 1:20 am, the driver and front passenger in the Nissan exited the vehicle and ran back to Mexico. Nine illegal aliens were left inside the Nissan. CBP officers, including Alarid, secured the aliens. I believe that the driver and front passenger fled because they saw that Alarid was no longer positioned to admit them into the U.S.

14. On 5/3/08, at 1:47 am, Alarid was manning primary lane 5 at the Otay Mesa POE. Three pickup trucks and a sedan, as well as a truck that appears uninvolved, were in line one after the other for lane 5. All the pickups had covers over the rear beds. Alarid admitted all the vehicles in less than 90 seconds. For each vehicle, Alarid took something from the driver, stepped into his booth, then handed something back to the driver. The pickups and sedan drove to an alley behind a house in Chula Vista. Agents later searched the premises and found 30 illegal aliens inside an 8 x 12 foot freestanding structure in the rear yard and an additional 10 illegal aliens inside the rear house.

Case 3:08-mj-01563-CAB    Document 1    Filed 05/19/2008    Page 5 of 8

4

15. One individual (MW-1) said she was a citizen and resident of Mexico with no lawful right to be in the United States. MW-1 said she arranged to enter the U.S. through a person in Mexico. The fee was $5,000. The person guaranteed the trip and said the price was high because he worked with an immigration officer who would wave everyone through. MW-1 and the others were placed aboard three trucks and a car. MW-1's truck contained about 17-18 other aliens, and she was placed near the gas pedal. The driver indicated he was waiting for the immigration officer's mother to tell them which lane to use. MW-1 subsequently heard a radio call in which a female voice told them to go and which lane to use. The truck drove forward. Shortly after, the driver yelled that they had made it.

16. Another person arrested for harboring illegal aliens on this date (D-1) stated in a post-arrest interview that there was an inspector at the Otay Mesa POE who allowed the aliens through. D-1 said the inspector's mother lived in Mexico and helped coordinate the smuggling. D-1 said the inspector was getting paid a lot of money to let the vehicles through.

17. I believe Alarid currently lives at 2727 Elrose Drive, San Diego, California. SDG&E records list Alarid as the subscriber for that location; he activated service in late April 2008. On 5/3/08, agents saw Alarid arrive at the Elrose Drive residence. On 5/4/08, agents saw Alarid outside the Elrose Drive residence. In addition, agents have seen Alarid driving a white Dodge Durango on multiple occasions, including when he arrived at the employee parking lot on 3/5/08 and 3/12/08, described above. The Durango is registered to Alarid and his wife. Agents have seen the Durango parked outside the Elrose Drive address multiple times during varying hours of the day including on 5/16/08.

18. In my experience, persons engaged in drug and alien smuggling, and bribery, often deal in cash because it is less traceable, and sometimes keep such monies in their residences. In addition, they sometimes possess at their residences assets purchased with the illegally-gained monies, and they may keep at their residences documents identifying accounts where such monies may be stored. They may also keep at their residences financial and tax records that, when analyzed, help determine the person's legal and illegal income.

WHEREFORE, I request that the court issue a search warrant for the location in paragraph 2 to seize the items in attachment B.

_____
TERRY C. REED, JR., Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me on May 16, 2008.

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

     2727 Elrose Drive, San Diego, California, is a one-story, single family residence on the south side of Elrose Drive, between Dearborn Drive to the east and Elrose Court to the west. The residence is yellow with a brown roof; part of the exterior has a brick facade. The numerals 2727 are in black, facing east, on what appears to be a gray storm drain or gutter. The numerals 2727 are also painted in black, against a white background, on the curb in front of the residence. The front door is blue-gray and faces north. A photograph of the residence is attached.



# ATTACHMENT B

1. U.S. currency over $500;

2. Assets originally priced at $500 or more and acquired since February 2008;

3. Documents, records, and other items tending to establish or hide the whereabouts of proceeds from drug trafficking, alien smuggling, and bribery, such as safes, safe deposit box contracts and keys, storage locker contracts and keys, financial records and ledgers, bank and credit card statements, wire transfer records, receipts, records listing account numbers, tax records, and real property and title documents;

4. Documents, records, and other items tending to track or account for aliens or drugs smuggled, or bribes paid or received;

5. Letters, notes, memoranda, address and phone books, papers listing names or phone numbers, electronic organizers, videos, and photographs that identify or tend to identify co-conspirators and other criminal associates;

6. Bills or other business-related documents, identification documents, correspondence, and photographs that establish or tend to show dominion and control over the premises; and

7. Cellular phones and other communication equipment used or that may have been used to contact co-conspirators and other criminal associates.